# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FRIENDS OF MAYANOT INSTITUTE, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 16-cv-01436 (APM) |
| ISLAMIC REPUBLIC OF IRAN, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

From July 12, 2006, through August 14, 2006, the Hezbollah terrorist organization perpetrated a prolonged attack ("2006 attack") along the border between Israel and Lebanon, firing thousands of rockets and missiles at civilian targets in northern Israel. Plaintiff Friends of Mayanot Institute, Inc. ("Plaintiff" or "Mayanot")—a New York non-profit corporation that operates educational, experiential learning, and leadership training programs in Israel—claims that it suffered economic losses as a result of the 2006 attack. It brings this action against the Islamic Republic of Iran under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*, asserting that Iran's material support of Hezbollah in furtherance of the 2006 attack renders Iran liable for the resulting economic losses it suffered.

Iran has never entered an appearance in this action, and upon Plaintiff's request, the Clerk of Court entered default against Iran on May 17, 2017. Plaintiff subsequently moved for entry of default judgment against Iran as to liability, additionally requesting that the court appoint a Special Master to determine the amount of damages to be awarded to Plaintiff pursuant to 28 U.S.C. § 1605A(e). For the reasons stated below, the court denies without prejudice Plaintiff's motion for default judgment on liability.

I.  **FINDINGS OF FACT**

The court begins by making factual findings regarding the 2006 attack—including Iran's involvement—as well as the financial status of Plaintiff Mayanot's business in Israel before and after the attack. To do so, the court draws upon the allegations contained in Plaintiff's complaint and motion for entry of default judgment, which rely extensively upon the findings of other judges in this District Court in other related matters and on United States government official reports.

Additionally, the court takes judicial notice of the underlying evidentiary record in *Kaplan v. Central Bank of the Islamic Republic of Iran*, 55 F. Supp. 3d 189 (D.D.C. 2014), in making its findings of fact in this case.[1] In *Kaplan*, a number of American nationals—injured survivors and family members of victims of the 2006 attack—filed suit in this District Court under the state-sponsored terrorism exception to the FSIA, 28 U.S.C. § 1605A, asserting that North Korea and Iran were liable for injuries caused by the 2006 attack because they provided material support and resources to Hezbollah. *See Kaplan*, 55 F. Supp. 3d at 197. Presiding over the case, Judge Lamberth conducted a hearing to determine the liability of North Korea and Iran for the 2006 attack, receiving evidence and testimony from a number of expert witnesses. *See id.* at 192–98. Based on that record, the court made extensive findings of fact and conclusions of law in finding North Korea and Iran liable under 28 U.S.C. § 1605A(c). *See generally Kaplan*, 55 F. Supp. 3d 189. In taking judicial notice of the proceedings in *Kaplan*, this court is mindful that it must not "simply adopt previous factual findings without scrutiny" and must "reach [its] own, independent

---

[1] The court grants Plaintiff's Motion to Take Judicial Notice of the Findings and Record in *Kaplan v. Central Bank of the Islamic Republic of Iran*, 55 F. Supp. 3d 189 (D.D.C. 2014). *See* ECF No. 18. A court may "take judicial notice of, and give effect to, its own records in another but interrelated proceeding." *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 73 (D.D.C. 2014) (quoting *Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938)); *see* Fed. R. Evid. 201(b) (allowing a court to "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). Courts adjudicating FSIA claims "frequently take[] judicial notice of earlier, related cases arising under the state sponsored terrorism exception to foreign sovereign immunity." *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 319 (D.D.C. 2014).

findings of fact" in the case at hand. *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 319–20 (D.D.C. 2014) (quoting *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 73–74 (D.D.C. 2014)).

### A. Hezbollah and the July-August 2006 Attack

Hezbollah—Arabic for "Party of God"—is a radical Shi'ite Islamic group founded in Lebanon "under the auspices of the government of Iran." *Peterson v. Republic of Iran*, 264 F. Supp. 2d 46, 51 (D.D.C. 2003); *see* Pl.'s Mot. to Take Judicial Notice & for Entry of Default J., ECF No. 18 [hereinafter Pl.'s Mot.], Ex. C, ECF No. 18-3 [hereinafter Podoler Decl.] ¶¶ 26–27. Hezbollah is opposed to the United States and the state of Israel, and has been designated a "Foreign Terrorist Organization" by the U.S. Department of State since 1997. *See Designation of Foreign Terrorist Organizations*, 62 Fed. Reg. 52,650 (Oct. 8, 1997); *Kaplan*, 55 F. Supp. 3d at 193. Hezbollah historically has engaged in acts of terror against Israeli and U.S. targets, and carried out the July-August 2006 attack at issue in this case. *See Kaplan*, 55 F. Supp. 3d at 193; Pl.'s Mot., Ex. A, ECF No. 18-1 [hereinafter Rubin Decl.], at 8–11; Suppl. Decl., ECF No. 21, Ex. B, ECF No. 21-2 [hereinafter *Kaplan* Hr'g Tr.], at 10–11 (testimony of Dr. Podoler explaining that he "can't point to any other group, militant or other" other than Hezbollah "that could have launched such a prolonged and heavy attack"); *Kaplan* Hr'g Tr. at 30–31 (testimony of Dr. Bechtol explaining that "[Hezbollah] told the world that they were responsible for attacking . . . Israeli civilians and military facilities in 2006").

Beginning on July 12, 2006 and continuing until August 14, 2006, Hezbollah engaged in a prolonged attack across the Lebanese border into northern Israel, firing thousands of missiles and rockets on Israel's northern civilian communities. Rubin Decl. ¶¶ 27–28. Hezbollah simultaneously engaged in a ground infiltration of Israel's northern border. Podoler Decl. ¶ 7.

Forty-three civilians were killed as a result of Hezbollah rocket fire during the attack, and 4,262 civilians were injured. Rubin Decl. ¶ 29.

> B. **Iran's Support of Hezbollah**

Judges of this District Court have held that Iran supports Hezbollah. *See, e.g.*, *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 292 (D.D.C. 2003) ("[Hezbollah] is an Iranian proxy organization, controlled, funded and operated by Iran."); *Peterson*, 264 F. Supp. 2d at 53 ("It is clear that the formation and emergence of Hezbollah as a major terrorist organization is due to the government of Iran. Hezbollah presently receives extensive financial and military technical support from Iran, which funds and supports terrorist activities."). Dr. Podoler characterized Iran as Hezbollah's "closest ally, providing it with political, economic[], and military assistance" since its founding, Podoler Decl. ¶ 27, and Dr. Bechtol testified at the *Kaplan* hearing that there is "[no] other way to describe" the relationship between Iran and Hezbollah other than that "Hezbollah is a project of Iran," *Kaplan* Hr'g Tr. at 29.

The court finds that Iran's historical support of Hezbollah and its terrorist acts includes material support and the provision of resources to Hezbollah in support of its commission of the 2006 attack. *See Kaplan*, 55 F. Supp. 3d at 197. Specifically, Iran provided financial support and weapons, as well as weapons training, to Hezbollah prior to the attack. During the *Kaplan* hearing, Dr. Bechtol explained that "[t]his whole thing"—the 2006 attack—"was financed by Iran." *Kaplan* Hr'g Tr. at 28. According to Dr. Podoler, "[o]n the eve of the [rocket attacks] in 2006, Iran's status in Lebanon was particularly strong": at that time, Iran provided training to Hezbollah fighters; delivered Iranian missiles, firing systems, and launching equipment to Hezbollah; and assisted in the identification of targets and firing the weapons provided. Podoler Decl. ¶ 28. Evidence introduced during the *Kaplan* hearing also establishes that Iran worked in concert with North

4

Korea and Syria to provide the rocket and missile components that Hezbollah used in the 2006 attack. *See generally Kaplan* Hr'g Tr. Specifically, North Korea, as Iran's "key supplier of arms," sent rocket and missile components to Iran to be assembled and then shipped to Hezbollah through Syria. *Id.* at 29–30. Iran also secured the assistance of North Korean instructors who cooperated with Iranian engineers to construct a sophisticated underground tunnel network in southern Lebanon to move Hezbollah fighters during the 2006 attack. Podoler Decl. ¶¶ 30–31. The underground tunnel network enabled Hezbollah to "hide the troops from being hit by Israeli retaliations" during the 2006 attack and also likely served as a hiding place for Hezbollah's stockpile of missiles and rockets. *Kaplan* Hr'g Tr. at 18, 27.

In light of this evidence, the court finds that Iran provided material support and resources to Hezbollah in carrying out the 2006 attack at issue here.

    **C.    Plaintiff Mayanot**

For nearly twenty years Mayanot has operated educational, experiential learning, and leadership training programs in Israel. Pl.'s Mot., Ex. D, ECF No. 18-4 [hereinafter Shemtov Decl.], ¶ 3. Specifically, Mayanot operates a religious academy, or yeshiva, for men; a women's study program; a summer study program; and heritage travel programs in conjunction with Birthright Israel, an American organization that sponsors trips to Israel for young Jewish men and women. *Id.* ¶ 4. After the 2006 Hezbollah attack, enrollment and participation in Mayanot's programs declined. *Id.* ¶¶ 7–8. For example, prior to the 2006 attack, the Mayanot yeshiva had 80 full-time students enrolled; by the end of the attack, enrollment in the yeshiva declined to fewer than 20 students. *Id.* ¶¶ 9–12. Mayanot was forced to cancel its 2006 summer study program due to withdrawals and cancellations by enrolled participants. *Id.* ¶¶ 20–21. Additionally, although in a typical year Mayanot conducts Birthright Israel heritage trips in Israel for approximately 3,200

5

individuals, participation in Mayanot's Birthright travel programs in 2006 declined 50%, to approximately 1,600 individuals. *Id.* ¶¶ 14–19.

## II. PROCEDURAL HISTORY

Plaintiff brought this lawsuit against the Islamic Republic of Iran on July 12, 2016. *See* Compl., ECF No. 1. Plaintiff filed its Amended Complaint on October 19, 2016, and requested a summons to issue. *See* Am. Compl., ECF No. 4; Req. for Summons to Issue, ECF No. 5. After concluding that service could not be accomplished, Plaintiff asked the Clerk of Court to mail by DHL Express one copy of the summons, complaint, and notice of suit, together with a translation of each, to the Foreign Minister of the Islamic Republic of Iran. *See* Aff. Requesting Foreign Mailing, ECF No. 9; Certificate of Mailing, ECF No. 10.

On March 29, 2017, Plaintiff filed proof of service, reflecting that an individual in the Ministry of Foreign Affairs in Tehran signed for the package sent by the Clerk of Court. *See* Notice of Filing of Proof of Service, ECF No. 12, Ex. A, ECF No. 12-1. When Iran failed to file an Answer to the Amended Complaint within 60 days, the Clerk of Court entered default. *See* Clerk's Entry of Default as to the Islamic Republic of Iran, ECF. No. 15 (dated May 17, 2017); 28 U.S.C. § 1608(d); Fed. R. Civ. P. 55(a). Plaintiff then filed the Motion for Entry of Default Judgment presently before the court. *See* Pl.'s Mot.

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 55(b)(2), the court may enter default judgment upon application by a party seeking that relief. Although there are "strong policies favoring the resolution of genuine disputes on their merits," default judgments are appropriate "when the adversary process has been halted because of an essentially unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 835–36 (D.C. Cir. 1980) (citation omitted). "[E]ntry of a default judgment is not

automatic," however. *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). The court has an "affirmative obligation to determine whether it has subject-matter jurisdiction over the action," *Friends Christian High School v. Geneva Fin. Consultants*, 321 F.R.D. 20, 22 (D.D.C. 2017) (internal quotation marks omitted), and also should "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant," *Mwani*, 417 F.3d at 6. "The party seeking default judgment has the burden of establishing both subject matter jurisdiction over the claim[] and personal jurisdiction over the defendant[]." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016).

In order to secure a default judgment under the FSIA, Plaintiff must "establish[] [its] claim or right to relief by evidence satisfactory to the court," 28 U.S.C. § 1608(e), a standard that "mirrors a provision in Federal Rule of Civil Procedure 55(d) governing default judgments against the U.S. Government," *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017). Section 1608(e)'s standard thereby "provides foreign sovereigns a special protection akin to that assured the federal government" in Rule 55. *See Thuneibat*, 167 F. Supp. 3d at 33 (citing *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014)). "Precisely what that standard entails—that is, how much and what kind of evidence the default provision requires—is unclear," and thus the FSIA "leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1046–47 (D.C. Cir. 2014).

In making that determination, the court "may not unquestioningly accept a complaint's unsupported allegations as true," *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012), but "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true," *Thuneibat*, 167 F. Supp. 3d at 33. Critically, in assessing whether a plaintiff

7

has established a claim under the FSIA, the court "must be mindful that Congress enacted Section 1605A, FSIA's terrorism exception, and Section 1608(e) with the 'aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins.'" *Id.* (quoting *Han Kim*, 774 F.3d at 1047–48).

## IV. CONCLUSIONS OF LAW

In the FSIA context, default judgment may be entered if: (1) the court has subject matter jurisdiction over the claims; (2) personal jurisdiction is properly exercised over Defendant; and (3) Plaintiff has presented satisfactory evidence to establish its claim against Defendant. *See id.* The court addresses each of these requirements in turn.

### A. Subject Matter Jurisdiction

This court has original jurisdiction over suits against a foreign state "without regard to amount in controversy" if the case is a nonjury civil action for in personam relief and the foreign state is not entitled to immunity under 28 U.S.C. §§ 1605–1607. 28 U.S.C. § 1330(a). Although the FSIA generally insulates foreign states from suit in American courts, as relevant here, the FSIA provides an exception to a foreign state's sovereign immunity in 28 U.S.C. § 1605A, known colloquially as the "state-sponsored terrorism exception." In pertinent part, the exception abrogates a foreign state's sovereign immunity in any case:

> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, *or the provision of material support or resources for such an act* if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1) (emphasis added). It is the "material support or resources" provision that Plaintiff relies upon here.

8

In order to have his or her claim heard, a plaintiff relying upon the state-sponsored terrorism exception must prove that: (1) the foreign state was designated a "state sponsor of terrorism" by the U.S. Department of State at the time the alleged action took place; (2) the claimant or victim was a national of the United States at the time the act took place; and (3) if the act "occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(A)(i)–(iii); *see also Thuneibat*, 167 F. Supp. 3d at 34.

The court concludes that subject matter jurisdiction exists under the FSIA's state-sponsored terrorism exception and that the court may hear Plaintiff's claim. First, as established above, satisfactory evidence has been presented that Iran provided "material support and resources" to Hezbollah within the meaning of § 1605A for the 2006 attack. "Material support or resources" includes the provision of "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . ., and transportation, except medicine or religious materials." 28 U.S.C. § 1605A(h)(3); 18 U.S.C. § 2339A. Plaintiff has supplied satisfactory proof that Iran provided material support and resources to Hezbollah in the form of financial services and support, weapons, and training, thereby enabling Hezbollah to perpetrate the 2006 attack. Second, Iran was designated a "state sponsor of terrorism" within the meaning of 28 U.S.C. § 1605A(h)(6) at the time of the 2006 attack, and has been so designated by the Secretary of State since January 19, 1984. *See* U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm (last visited May 1, 2018). Third, Plaintiff has satisfied Section 1605A(a)(2)(A)(ii) by virtue of the *Kaplan* plaintiffs' claim against Iran. *Cf. La Reunion*

*Aerienne v. Socialist People's Libyan Arab Jamahiriya*, 533 F.3d 837, 843–44 (D.C. Cir. 2008) (rejecting argument that third-party corporate claimants could not bring suit under the FSIA's earlier version of the terrorism exception, 28 U.S.C. § 1605(a)(7), where the statutory text was clear that "if either the claimant *or the victim* is a national of the United States, then immunity is waived" (emphasis added)). And, finally, Plaintiff's suit satisfies Section 1605A(a)(2)(A)(iii), as the acts of terrorism at issue did not occur in Iran, rendering an opportunity to arbitrate unnecessary. Accordingly, Iran does not enjoy foreign sovereign immunity from Plaintiff's suit pursuant to 28 U.S.C. § 1605A, and this court possesses original jurisdiction over this matter pursuant to 28 U.S.C. § 1330(a).

### B.  Personal Jurisdiction

The court next assesses whether effective service has been made, as required by 28 U.S.C. § 1330(b), which governs personal jurisdiction over a foreign state and requires that service be made pursuant to 28 U.S.C. § 1608. Section 1608 provides four alternative means of effecting service on a foreign state: (1) by "special arrangement for service between the plaintiff and the foreign state or political subdivision"; (2) "if no special arrangement exists . . . in accordance with an applicable international convention on service of judicial documents"; (3) if service cannot be made under the first two options, then "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned"; or (4) if service cannot be made within 30 days under the third option, then by requesting that the clerk of the court send two copies of the aforementioned materials to "the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services," whereupon the

Secretary transmits "one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic notice indicating when the papers were transmitted." 28 U.S.C. § 1608(a).

Plaintiff properly effected service in accordance with Section 1608(a)(3). On March 29, 2017, Plaintiff filed with the court proof that the Complaint, Summons, and Notice of Suit, together with translations of each in Farsi, were served on the Minister of Foreign Affairs and signed for in Tehran, Iran. *See* Notice of Filing of Proof of Service. Service in accordance with Section 1608(a)(3) was appropriate because Iran is subject to extensive U.S. sanctions and, at the time Plaintiff commenced its suit, service of court papers to Iran could not be accomplished under subsections 1608(a)(1) or (2). *See* Pl.'s Second Status Report Regarding Service of Process, ECF No. 11. Accordingly, Plaintiff has established that service was properly effected against Iran and the court is satisfied that it may exercise personal jurisdiction over Iran.

### C. Iran's Liability to Plaintiff under 28 U.S.C. § 1605A(d)

Plaintiff Mayanot brings its claim against Iran under 28 U.S.C. § 1605A(d), alleging that Iran is liable for the "reasonably foreseeable property loss" it sustained, purportedly "by reason of" Iran's material support and provision of resources to Hezbollah for the 2006 attack. 28 U.S.C. § 1605A(d). "After an action has been brought under [Section 1605A(c)]," Section 1605A(d) provides that "actions may also be brought" for recovery of "reasonably foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies, by reason of the same acts on which the action under [Section 1605A(c)] is based." *Id.* In other words, under the language of Section 1605A, "once a party with valid [statutory] standing has brought an action under [Section] 1605A(c), it is unnecessary for a party filing suit under [Section] 1605A(d) to establish standing separately; [statutory] standing under

11

[Section] 1605A(d) is derivative of that under [Section] 1605A(c)." *Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya*, 811 F. Supp. 2d 53, 71 (D.D.C. 2011). The plaintiffs in *Kaplan* had proper statutory standing to bring their suit against Iran under Section 1605A(c), 55 F. Supp. 3d at 198, and therefore, Mayanot may bring a suit seeking recovery for "reasonably foreseeable property loss . . . by reason of the same acts," i.e., the 2006 attack. *See Certain Underwriters*, 811 F. Supp. 2d at 71–72; *see also In re: Terrorist Attacks on September 11, 2001*, No. 03-MDL-1570, 2015 WL 9468813, at *1–2 (S.D.N.Y. Dec. 28, 2015) (allowing federal insurance carriers that made payments in response to property damage and business interruption caused by the September 11, 2001 terrorist attacks to bring suit against Iran under Section 1605A(d) to recover compensatory damages, after an action was brought under Section 1605A(c) by the estates of persons who either were on the planes that crashed or were present at the World Trade Center and the Pentagon during the attacks).

       1.     *Quantum of Evidence Required by 28 U.S.C. § 1608(e)*

Although Plaintiff has established its standing to bring this action and seek recovery of its property losses from Iran, the court concludes that Plaintiff has failed to "establish [its] . . . right to relief by evidence that is satisfactory to the court" in accordance with Section 1608(e). Mayanot offers insufficient *admissible* evidence to support its claim that it sustained "reasonably foreseeable property loss" "by reason of" Iran's material support and provision of resources to Hezbollah.

Plaintiff's action for recovery of property loss hinges on its contention that the 2006 Hezbollah attack "directly caused" the financial losses Mayanot incurred following the attack. *E.g.*, Am. Compl. ¶ 26. In support of this central contention, Plaintiff offers only a five-page declaration from Rabbi Kasriel Shemtov, one of the Directors of Mayanot. *See* Shemtov Decl.

12

Shemtov's Declaration details the financial losses to Mayanot's yeshiva, summer study program, and Birthright travel programs in 2006, asserting that "as a direct result of the Hezbollah Attack, enrollment and participation in Mayanot Israel programs declined precipitously." Shemtov Decl. ¶ 7. Shemtov states that "American and other students withdrew from the Yeshiva and the summer program, and cancelled future plans to attend. Most of these students explicitly told Mayanot that they were withdrawing or cancelling their plans because of the ongoing Hezbollah Attack." *Id.* ¶ 8. Shemtov additionally explains that "[a]s a direct result of the Hezbollah Attack, Mayanot suffered cancellations [of] approximately 1,600 Birthright participants. . . . Many of these participants informed Mayanot explicitly that they were cancelling their trips due to the ongoing Hezbollah Attack." *Id.* ¶ 15. In Shemtov's view, "[a]s with the Yeshiva withdrawals and cancellations, no reason other than the Hezbollah Attack would explain the extraordinarily high rate of cancellations by Birthright participants." *Id.* In sum, Shemtov estimates that the property loss incurred by Mayanot "resulting directly from the Hezbollah Attack" is "in excess of $1,000,000.00." *Id.* ¶ 24.

But standing alone, Shemtov's Declaration does not provide sufficient, admissible proof to establish that Mayanot suffered financial loss "by reason of" Iran's material support and provision of resources to Hezbollah. "In order to issue a default judgment under § 1608(e), a court must base its findings of fact and conclusions of law upon evidence admissible under the Federal Rules of Evidence." *Owens*, 864 F.3d at 786 (citing *Han Kim*, 774 F.3d at 1049). Here, the only *admissible* proof of causation that Mayanot offers are Shemtov's representations about the approximate number of students that left the yeshiva and the number of cancellations of Birthright program trips that occurred around the time of the 2006 attack. That evidence on its own establishes a correlation between the reduced yeshiva enrollment and the increase in trip

13

cancellations and the 2006 attack, but not necessarily causation. *Cf. Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2346 (2016) (observing that "plaintiffs[] [who] b[ear] the burden of proof" "cannot simply point to temporal correlation and call it causation"); *Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135, 173 (2003) ("Correlation is not causation.").

The only other evidence of causation presented in Shemtov's Declarations—statements from yeshiva and summer program students and Birthright participants informing Mayanot that their cancellations and withdrawals were due to the Hezbollah attack, *see* Shemtov Decl. ¶¶ 11, 15—constitute inadmissible hearsay. These are statements made out of court that Mayanot offers "to prove the truth of the matter asserted"—namely, that the Hezbollah attack was in fact why these students and trip participants withdrew from Mayanot's programs. *See* Fed. R. Evid. 801. Indeed, the unreliability of these statements is underscored by the fact that Shemtov does not state whether he heard these statements himself or received these explanations from some other interlocutor. In sum, Mayanot offers insufficient admissible evidence to support its claim that Iran's provision of material support and resources to Hezbollah in the 2006 attack *caused* Mayanot to incur financial losses. This shortfall of admissible evidence is fatal to Mayanot's claim on the present motion.

The court acknowledges that the D.C. Circuit has encouraged application of a "lenient standard" when assessing the quantum of proof required to establish liability in a FSIA case against a defaulting state sponsor of terrorism. *See Owens*, 864 F.3d at 785. But such leniency is most appropriate when, as is often the case in FSIA terrorism actions, "firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Id.*; *see also Han Kim*, 774 F.3d at 1048–51 (permitting plaintiff estate to establish the Democratic People's Republic of Korea's liability under Section 1605A(c) for the deceased's

torture and extrajudicial killing by indirect evidence because, given DPRK's "repressive practices," intimidation of defectors and witnesses, and the nature of cases of forced disappearance, "direct evidence of subsequent torture and execution will, by definition, almost always be unavailable"). Those circumstances are not present here. Unlike evidence made unavailable by reason of repression, intimidation, or extrajudicial killings, evidence demonstrating that students and participants withdrew from Mayanot's programs because of the 2006 attack can be readily secured, for example, by affidavit or deposition of some number of those individuals. Absent such admissible evidence, the court cannot conclude that Plaintiff's case has been established "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). The court therefore denies Plaintiff's motion to enter default judgment against Iran. The denial is without prejudice, so as to afford Mayanot an opportunity to re-file its motion for entry of default judgment supported with additional, admissible evidence.[2]

### 2. *Theory of Recovery under 28 U.S.C. § 1605A(d)*

In concluding that Plaintiff has not submitted "satisfactory" admissible evidence to the court to establish its claim, the court does not address whether, even if Plaintiff had provided admissible evidence of causation, Plaintiff can establish that its business losses are "reasonably foreseeable" and recoverable "by reason of the [2006 attack]" under 28 U.S.C. § 1605A(d).

In order to satisfy the statutory elements of causation and injury, plaintiffs in actions arising under companion Section 1605A(c) "must articulate the justification for such recovery, generally through the lens of civil tort liability." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163,

---

[2] In finding the present record lacking to prove causation, the court does not mean to intimate that Mayanot must obtain a sworn statement from every student that withdrew from the yeshiva or summer program or decided against traveling to Israel as a Birthright participant. Mayanot, however, must come forward with some quantum of first-hand proof to satisfy the court that the 2006 attack was the actual cause of those decisions, as opposed to just merely temporally related to the attack.

15

176 (D.D.C. 2010). In other words, "to properly raise a claim under [Section] 1605A(c)," a claimant "must identify a particular theory of tort liability—e.g., intentional infliction of emotional distress, wrongful death, [or] battery." *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 341 (D.D.C. 2016). In assessing liability under Section 1605A(c), federal courts are not authorized "to fashion a complete body of federal law," but must instead "find the relevant law." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003). Federal courts therefore "'rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions' to define the elements and scope of . . . theories of recovery" under 28 U.S.C. § 1605A(c). *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 399 (D.D.C. 2015) (quoting *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012)).

Whether plaintiffs in Section 1605A(d) actions likewise must articulate the justification for their recovery "through the lens of civil tort liability" is unclear. Although the statutory text of Section 1605A(d) similarly requires a showing of causation ("by reason of") and injury ("reasonably foreseeable property loss"), the conclusion that a Section 1605A(d) plaintiff must "identify a particular theory of tort liability" to recover is not an obvious one.[3] No case, to this court's knowledge, has addressed the issue.

Assuming without deciding that a plaintiff must proffer a specific theory of tort liability to sustain a Section 1605A(d) action, the court notes that the most analogous torts to the case at hand are intentional interference with performance of contract, Restatement (Second) of Torts § 766,

---

[3] Alternatively, a court assessing a Section 1605A(d) claim for "reasonably foreseeable" property loss recoverable "by reason of" an act of terrorism could simply apply well-established principles of tort law regarding causation and reasonable foreseeability to determine liability, rather than assessing the elements of a particular common law cause of action. *Cf. Oveissi*, 879 F. Supp. 2d at 57 (explaining that Section 1605A(d) "contains two causation elements: (1) the property loss must come 'by reason of' the [terrorist acts], and (2) the property loss must be a 'reasonably foreseeable' result of the [terrorist acts]").

and intentional interference with prospective contractual relation, *id.* § 766B. Both of those torts require as an element of proof knowledge on the part of the tortfeasor of the existence of a business contract or prospective contractual relation. *See id.* § 766 *cmt. i* ("To be subject to liability under [international interference with performance of contract by third person], the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract."); *see also Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 423 (E.D.N.Y. 2013) (claim of tortious interference with prospective business relationships requires proof of "defendant's knowledge of a business relationship between the plaintiff and a third party" (citing Restatement (Second) of Torts § 766B)). If such knowledge must be shown to recover in this case under Section 1605A, the present pleadings and record are inadequate because they are silent as to that element. Plaintiff has not asserted or shown that Iran had knowledge of Mayanot, let alone its contractual relationships and business opportunities. Should Plaintiff decide to re-file its motion, the court invites Plaintiff to address whether it must come forward with proof of such knowledge to recover under Section 1605A(d).

## V. CONCLUSION AND ORDER

For the reasons explained above, the court denies Plaintiff's Motion for Default Judgment without prejudice. Plaintiff's motion for appointment of a Special Master is accordingly denied as moot.

If Plaintiff seeks to re-file its motion and supplement the record with admissible evidence as to the damages purportedly incurred by Mayanot "by reason of" the 2006 attack, it must do so no later than July 2, 2018.

Dated: May 1, 2018　　　　　　　　　　　Amit P. Mehta
　　　　　　　　　　　　　　　　　　　　United States District Judge

17